

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed September 18, 2007**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| | § | |
| RONALD CHRISTOPHER PERES, | § | CASE NO. 05-36388-BJH-7 |
| DONNA PATRICIA MEDINA, | § | |
| | § | |
| Debtors. | § | |

---

| | | |
|---|---|---|
| WILLIAM T. NEARY, | § | |
| UNITED STATES TRUSTEE | § | |
| | § | |
| Plaintiff, | § | ADV. CASE NO. 05-3768 |
| | § | |
| v. | § | |
| | § | |
| RONALD CHRISTOPHER PERES, | § | |
| DONNA PATRICIA MEDINA, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Before the Court is the Complaint Objecting to Debtors' Discharge (the "Complaint") filed by William Neary, United States Trustee for the Northern District of Texas (the "U. S. Trustee"), against Ronald Peres and Donna Medina (respectively, "Peres" and "Medina,"and collectively, the "Debtors") asking this Court to deny the Debtors' discharge in accordance with 11 U.S.C. §§ 727(a)(2)(A), 727(a)(3), and 727(a)(4).[1] The Court has core jurisdiction over the Complaint in accordance with 28 U.S.C. §§ 1334 and 157(b)(2)(J). After a trial on August 21, 2007, the Court makes the following findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## I.     Factual Background

Peres' testimony at trial and the facts provided in the Statement of Financial Affairs ("SOFA"), as amended, establish that he has been an entrepreneur with various business enterprises over the years. For example, from August 2000 to late 2004, Peres operated "United Check Cashing," a check-cashing service. From August 2003 to September 2004, Peres also ran "Wireless R Us," which retailed cellular phones and cellular services. During 2000, Peres started a food catering business, "Flamingo Catering," which operated as "Chef's Chicken"[2] and was active for approximately one-and-a-half years. Finally, Peres owned Daryn Megan Group LLC ("DMG"), which owned some real estate, and Darun Peres LLC ("DP"), which was allegedly dormant.

Beginning in 2004, Peres testified that he started encountering a wide array of legal problems. In his words, he "didn't have one thing going straight." Audiotape: Trial conducted on 8/21/07 at

---

[1] The U.S. Trustee also objected to the Debtors' receipt of a discharge in accordance with 11 U.S.C. § 727(a)(5), but withdrew that objection at the commencement of trial.

[2] The SOFA identifies this business as "Chieft's [sic] Chicken." At trial, Peres identified it as "Chef's Chicken."

2:35:01-03 (on file with the Court). The Dallas Independent School District ("DISD") initiated eminent domain proceedings to "take" certain real property owned by the Debtors. The United States indicted Peres for his alleged role in some sort of fraudulent conspiracy.[3] Various bank accounts of the Debtors were frozen by Bank One for suspicion of check-kiting. Peres was sued by Brightpoint, a cellular phone company, for outstanding debts that he was unable to pay after the bank accounts were frozen. This turmoil and lack of available cash also lead to litigation with other creditors – namely, Chase Bank, Wells Fargo, and the landlord of the premises where the check-cashing business was conducted.

In the 2004/2005 time frame, the Debtors' real estate holdings underwent significant changes as well. On April 8, 2005, the eminent domain proceeding resulted in the entry of a judgment in the amount of $123,214.04 in the Debtors' favor for the "taking" of the Debtors' real property. From these proceeds, the Debtors paid off the first mortgage on their homestead, paid down the second mortgage on their homestead, and paid their attorney, Nathan Alex Bickley ("Bickley"), for representing them in the eminent domain proceeding. Peres also testified that in early 2004, DMG purchased an apartment complex on East Sixth Street in Irving, Texas for approximately $1.2 million. According to Peres, this property was sold at the end of 2004 for approximately $1.36 million. State and federal tax records indicate that the Debtors were the sole owners of DMG. Debtor's Exhibit 10. Certain bank statements of DMG were also introduced into evidence. U.S. Trustee Exhibit 7. According to Peres and the bank statements, $328,381.63 was deposited into a DMG bank account on December 17, 2004 from the sale of the East Sixth Street property. *Id*.;

---

[3] The indictment against Peres has been dismissed.

Audiotape: Trial conducted on 8/21/07 at 2:04:04-17 (on file with the Court). Over the next eight months, the bank statements for this DMG account reflect a $70,000 wire transfer to the Bank of Muscat,[4] periodic cash withdrawals of $400-$700, and a steady flow of money out of the account for the Debtors' personal expenditures – *i.e.*, purchases at Best Buy, Blockbuster, Busch Gardens, Walmart, etc. U.S. Trustee Exhibit 7. According to Peres, the Debtors had "exclusive" control over this DMG bank account. Audiotape: Trial conducted on 8/21/07 at 2:25:11-21 (on file with the Court).

On June 6, 2005, the Debtors filed a voluntary joint petition for relief under Chapter 7 of the Bankruptcy Code, initiating case number 06-31660-BJH-7 (the "Case"). The creditors' meeting required by 11 U.S.C. § 341 was scheduled for July 21, 2005, and was continued by the Chapter 7 trustee to several further sessions. On September 6, 2005, the Debtors amended certain of their Schedules (namely, Schedules A, B, C, I, and J), their SOFA, and their Statement of Intentions, and filed an agreed motion to substitute counsel.[5] On September 21, 2005, the Debtors amended Schedule F.

The U.S. Trustee filed the Complaint on November 18, 2005.

## II.     Legal Analysis

As noted previously, the U.S. Trustee urges the Court to deny the Debtors' discharge under several provisions of 11 U.S.C. § 727. As the party objecting to the grant of a discharge to the Debtors, the U.S. Trustee bears the burden of proving the requisite statutory elements by a

---

[4]According to Peres, this amount was transferred to his mother-in-law. Audiotape: Trial conducted on 8/21/07 at 1:52:17-57(on file with the Court).

[5] Due to the Debtors' failure to submit an order, the motion to substitute was not granted until July 18, 2007, although new counsel started filing pleadings and appearing in court on the Debtors' behalf in September 2005.

preponderance of the evidence. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992).

The Court will analyze each of the alleged bases for a denial of discharge, together with the relevant facts, in turn.

        **a.**       **11 U.S.C. § 727(a)(2)(A)**

The U.S. Trustee argues that the Debtors' use of the non-exempt proceeds realized from the eminent domain proceeding to pay off and pay down the first and second mortgages, respectively, on their exempt homestead precludes the Debtors' receipt of a discharge in the Case in accordance with § 727(a)(2)(A) of the Bankruptcy Code. Section 727(a)(2)(A) provides that a discharge should be denied if:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A).

By way of background, § 522 of the Bankruptcy Code allows an individual debtor to claim certain property as exempt in a bankruptcy case. In a bankruptcy case filed in Texas, a debtor may claim either the federal exemptions provided by the Bankruptcy Code or the exemptions provided by Texas state law. *Id*. §§ 522(b)(1) & 522(b)(2). Under the Bankruptcy Code, property claimed as exempt is exempt if no one timely objects to the debtor's claimed exemptions. *Id*. § 522(l). Exempt property is returned to the debtor and is not liquidated by the Chapter 7 trustee for the benefit of creditors.

As relevant here, the Debtors claimed their home on Carrington Drive in Coppell, Texas as

exempt property under Texas state law (the "Exempt Homestead"). *See* TEX. CONST. art. XVI, §§ 50 and 51; TEX. PROP. CODE §§ 41.001-.002. As a result of the pay off of the first mortgage and the pay down of the second mortgage, the Debtors converted non-exempt cash – *i.e.*, the proceeds from the eminent domain proceeding, into exempt property – *i.e.*, greater equity in the Exempt Homestead.

While the conversion of non-exempt assets into exempt assets can be the basis for denying a debtor's discharge, "evidence of actual intent to defraud creditors is required." *First Tex. Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 991 (5th Cir. 1983).[6] Actual intent may be inferred from the circumstances surrounding the debtor's conduct. *Id*. Courts have found the requisite intent when a debtor: (i) obtained credit to buy the exempt property, *id*. (collecting cases); (ii) converted non-exempt property into exempt property after the entry of a large judgment against him, *Ford v. Poston (In re Ford)*, 773 F.2d 52, 55 (4th Cir. 1985); (iii) engaged in a pattern of sharp dealing before bankruptcy, *In re Reed*, 700 F.2d at 991-92; (iv) misrepresented the value of assets and kept the transfers secret, *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 568 (7th Cir. 1989); and/or (v) transmutated assets in an amount sufficient to render the debtor insolvent., *Albuquerque Nat'l Bank v. Zouhar (In re Zouhar)*, 10 B.R. 154, 157 (Bankr. D. N.M. 1981). *See generally* 4 Alan N. Resnick, COLLIER ON BANKRUPTCY ¶ 727.02[3][g] (15th ed. rev. 2006) (collecting cases).

There is no compelling evidence of an actual intent to hinder, delay, or defraud creditors here – either directly or circumstantially. While Peres did not offer a particularly helpful explanation of why he decided to pay off the first mortgage and pay down the second mortgage on the Exempt

---

[6] While this case and others decided thereafter tend to focus on intent to defraud, evidence of actual intent to hinder or delay (*i.e.*, the other statutorily prohibited motives) would also suffice.

Homestead when he did, the evidence is uncontroverted that the Debtors were not considering a bankruptcy filing at that time. Specifically, counsel for the U.S. Trustee asked Peres the following question at trial: "When you have [\$1.2 million dollars] in other debt, why did you use [the eminent domain award] to pay off your first mortgage?" Audiotape: Trial conducted on 8/21/07 at 2:10:21-29 (on file with the Court). And Peres responded, "I just felt it was – that was what I needed to do at that time." *Id*. at 2:10:30-33. However, this line of questioning was pursued no further. And, this testimony, by itself, does not provide any compelling evidence of wrongful intent. Peres later flatly denied having any intention of filing bankruptcy at the time he made the decision to pay down the mortgages on the Exempt Homestead. In fact, Peres testified that the decision to file bankruptcy was made only a few days before the Case was actually filed. This testimony was corroborated by Bickley, the attorney who represented the Debtors in the eminent domain proceeding and filed the Case on their behalf. Bickley testified that it was only "a short period of time . . . maybe ten days" between advising Peres to file a bankruptcy petition and the actual filing of the Case.

So, on this record it is clear that the Debtors did not pay down their mortgages on the Exempt Homestead with the actual intent to thereafter file bankruptcy and attempt to discharge their other creditors' claims. Moreover, while it is clear that the Debtors had other substantial debts at that time, there is no evidence in the record that any of those creditors were actively pursuing collection of their claims against the Debtors. In addition, Peres testified that he thought he would be able to work through all of his financial difficulties "one way or another" until very shortly before the Case was filed. Audiotape: Trial conducted on 8/21/07 at 2:46:33-36 (on file with the Court). Finally, Peres testified that he had hoped to use proceeds he anticipated receiving from his lawsuits against United Check Cashing's landlord and/or Chase Bank to pay his other creditors. *Id*. at 3:07:44-08:29.

Since the U.S. Trustee has adduced no direct evidence, and negligible circumstantial evidence, of the Debtors' alleged intent to hinder, delay, or defraud creditors by converting non-exempt cash into the Exempt Homestead, the Court concludes that the U.S. Trustee has failed to carry its burden of proof. Accordingly, this objection to the Debtors' receipt of a discharge is denied. **b** **.**

### 11 U.S.C. § 727(a)(3)

Next, the U.S. Trustee observes that the Debtors failed to disclose their ownership interests in and/or list Flamingo Catering, United Check Cashing, Wireless R Us, Chef's Chicken, DP, and DMG in their original Schedule B and SOFA, and argues that "[t]he failure to accurately schedule their interests in, and the values of, these business interests constitutes concealment of recorded information from which the [Debtors'] financial condition or business transactions might be ascertained warranting denial of discharge pursuant to 11 U.S.C. § 727(a)(3)." Complaint, pages 5-6, Docket No. 1.

The U.S. Trustee has failed to state a proper claim against the Debtors under § 727(a)(3), which provides that a discharge should be denied if

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). The U.S. Trustee does not allege in the Complaint that the Debtors have hidden, destroyed, or failed to keep the records of these businesses in any way. Instead, the U.S. Trustee alleges that the Debtors failed to disclose these businesses entirely. While this allegation supports a claim under § 727(a)(4), which is the subject of the next section of this Memorandum Opinion, it does not support a claim under § 727(a)(3). Accordingly, this objection to the Debtors'

receipt of a discharge is denied.

### c. 11 U.S.C. § 727(a)(4)

The U.S. Trustee also alleges that the Debtors are ineligible for a discharge under § 727(a)(4)(A), which provides that a discharge should be denied if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4). A false statement or omission in a debtor's schedules can be a false oath sufficient to justify the denial of a discharge. *In re Beaubouef*, 966 F.2d at 178. To prevail on this claim, the U.S. Trustee has the burden of proving that (i) the Debtors made a statement under oath; (ii) the statement was false; (iii) the Debtors knew the statement was false; (iv) the Debtors made the statement with fraudulent intent; and (v) the statement related materially to the Case. *Id*. The allegedly false statements made under oath identified in the Complaint relate to the original and amended Schedules and SOFA signed and filed by the Debtors in the Case.

### 1. Statement under Oath

At the end of both the original and the amended SOFA filed by the Debtors, the signatures of both Debtors appear below the statement "I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto . . . and that they are true and correct." Below the signatures is the following warning: "*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. Sections 152 and 3571.*" *See also* Bankruptcy Rule 1008 (declaring that "[a]ll petitions, lists, schedules, statements and amendments thereto shall be verified").

The original Schedules filed by the Debtors are also accompanied by a signature page that the Debtors signed underneath the statement "I declare under penalty of perjury that I have read the

foregoing summary and schedules, consisting of 1 sheet [sic], and that they are true and correct to the best of my knowledge, information and belief." As with the SOFAs, there is a clear admonition regarding potential criminal penalties below these signatures. The amended Schedules filed by the Debtors on September 6, 2005 were unsigned. However, the Debtors did sign amended Schedule F, which was filed on September 21, 2005.

Thus, with the possible exception of the amended Schedules filed on September 6, 2005, all of the documents in question were submitted under oath. Of course, the September 6, 2005 amendments to the Schedules were required to be filed under oath as well in accordance with Bankruptcy Rule 1008.

### 2. False Statement

Question 4 of the SOFA directs the Debtors to "list all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case." On both the original and amended SOFAs, the Debtors listed three pending collection actions against them, and one judgment on a debt entered against them, but did not disclose the eminent domain proceeding.

Question 18 of the SOFA also directed the Debtors to

list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

On the Debtors' original SOFA, no businesses are listed at all. Similarly, on Schedule B, where the Debtors are required to disclose their stock holdings, their interests in incorporated and

unincorporated businesses, and their interests in partnerships or joint ventures as of the date of their bankruptcy filing, the Debtors originally stated that they had no such interests. The amended SOFA discloses the Debtors' involvement with Flamingo Catering, United Check Cashing, Wireless R Us, Chef's Chicken, DP, and DMG, while Amended Schedule B simply lists partnership interests in "Daryn Meegan Group, LLC" [sic] and "Darrin Pares, LLC" [sic] as the Debtors' personal property.[7]

In addition to these false statement about their business interests, the Debtors did not disclose any income for 2004 or 2005 (year-to-date) on their original SOFA in response to question 1. Moreover, the income disclosed for 2003 on the original SOFA is clearly false in light of the 2003 income disclosed on the amended SOFA. And, while the amended SOFA also lists a $169,933 "net loss" for United Check Cashing in 2004, the SOFA directed the Debtors to state the "*gross* amount of income the debtor received from . . . operation of the debtor's business." (emphasis added). The Debtors' disclosure of United Check Cashing's "net loss" is simply non-responsive. Furthermore, the Debtors state in their amended SOFA in response to questions 1 and 2 that they had zero year-to-date income from any source in 2005, despite the fact that they had been using money from the DMG bank account to pay at least some of their personal expenses for most of the year. *See* U.S. Trustee Exhibit 7; Audiotape: Trial conducted on 8/21/07 at 1:45:48-52 (on file with the Court) (testimony on admission by Medina that money from the account was used for personal expenses). The money that the Debtors had been taking from DMG should have been disclosed as income to them in 2005.

---

[7] The names of both of these LLCs are spelled differently between the Schedules and the SOFA. In addition, it is unclear from the evidence introduced at trial if the other businesses disclosed on the amended SOFA were still in existence on the petition date. If these other businesses were separate legal entities that had not been dissolved in accordance with applicable state law on the petition date, then the Debtors were still interest holders in them and their interests were required to be disclosed on Schedule B, irrespective of the value of those interests.

Obviously, the original Schedules and SOFA, having failed to disclose the eminent domain proceeding, the Debtors' interests in various businesses, the Debtors' income, and the existence of the bank account from which they had been withdrawing funds to pay their household expenses, are false. While the U.S. Trustee argues that amended Schedule B is still false because it lists the value of the Debtors' interest in DMG as zero, which is, according to the U.S. Trustee, contradicted by the fact that DMG paid the Debtor's counsel $10,000 around the time that the amended Schedules were filed (*see* Amended Disclosure of Attorney Compensation, Docket No. 20, Case No. 05-36388), the Court is unpersuaded that this evidence, standing alone, proves the falsity of the stated "zero" value for the Debtors' equity interest in DMG. An entity may have some cash but still have no equity value depending on the extent of creditor claims against the entity. And, as noted previously, it is unclear on this record if amended Schedule B is accurate because it is unclear if the Debtors continued to hold interests in other business entities on the petition date which should have been disclosed. *See* n.7, *supra*. However, what is clear on this record is that the amended SOFA does not accurately disclose the Debtors' income for 2004 and 2005 and still fails to disclose the bank account from which the Debtors had been paying their personal expenses and the eminent domain proceeding, which makes it a false statement as well.

### 3.    Knowledge of Falsity

The Debtors' knowledge that their statements were false may be inferred from circumstantial evidence. *Shah v. Shah (In re Shah)*, 350 B.R. 69, 73 (Bankr. S.D. Tex. 2006). Here, the evidence shows that the eminent domain proceeding resulted in a significant cash award to the Debtors less than two months prior to the filing of the Case. It is obvious that the Debtors had knowledge of the eminent domain proceeding when the Case was filed.

The evidence also shows that the Debtors had knowledge of DMG's existence. Bank statements from a DMG account show that the Debtors frequently used monies from this account to pay for their personal expenses for months prior to their bankruptcy filing. Moreover, Brad Perdue ("Perdue"), a bankruptcy analyst for the U. S. Trustee, testified that Medina became quite upset when Daniel Sherman, the Chapter 7 trustee (the "Trustee"), told her to stop spending money from the DMG bank account at the § 341 meeting after he learned about DMG's existence and the fact that it had funds in a bank account.[8] Specifically, Perdue recalled Medina asking the Trustee "[h]ow am I supposed to raise my children without money?" Audiotape: Trial conducted on 8/21/07 at 1:45:48-52 (on file with the Court).

Similarly, the Debtors must have had knowledge of their current and former business ventures. This is especially true for United Check Cashing and Wireless R Us, both of which had been operating within the year before the filing of the Case.

On this record, the Court is satisfied that the Debtors knew of the falsity of statements contained in their Schedules and SOFAs.

### 4.     Fraudulent Intent

The Debtors argue that the false statements and/or omissions in the Schedules and SOFAs were the result of negligence, not fraudulent intent. However, the false statements and/or omissions are both significant and numerous, which demonstrates the Debtors' reckless indifference to the truth of the sworn Schedules and SOFAs. Reckless indifference to the truth of verified bankruptcy documents is the equivalent of fraudulent intent. *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st

---

[8] The Debtors' ownership interest in DMG was property of the estate in accordance with 11 U.S.C. § 541(a). As the member of DMG, the Trustee was entitled to control the entity and its assets.

**Memorandum Opinion**                                                                                      **Page 13**

Cir. 1987). As the First Circuit explained in *In re Tully*, "[a] debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *Id*. at 111.

The sheer number of significant omissions in a debtor's schedules can be circumstantial evidence of recklessness: "The cumulative effect of . . . falsehoods" in bankruptcy documents may evidence "a pattern of reckless and cavalier disregard for the truth [to support] fraudulent intent." *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 383 (5th Cir. 2001) (quoting *Economy Brick Sales, Inc. v. Gonday (In re Gonday)*, 27 B.R. 428, 432 (Bankr. M.D. La. 1983)); *Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 767 (Bankr. N.D. Tex. 2005) (same). Here, the Debtors failed to disclose (i) the bank account that they had been withdrawing funds from for household expenses, (ii) their ownership of the company in whose name that bank account was styled, (iii) at least five other business entities that the Debtors had owned and operated within the previous six years, (iv) their incomes, and (v) a lawsuit that they had been a party to only months before their bankruptcy documents were prepared and filed and from which they had received a significant cash award just two months prior to their bankruptcy filing. The cumulative effect of these falsehoods evidences the Debtors' reckless indifference to the truth and hence their fraudulent intent.

Furthermore, Peres testified several times that he did not read the Schedules or SOFAs before he signed them (under penalty of perjury) and caused them to be filed. According to Peres, he did not understand bankruptcy and relied on Bickley, his attorney, to prepare the documents properly. Peres' admission that he did not read the Schedules and SOFAs, which were to accurately represent *his* (and his wife's) financial condition to the Court and creditors, before filing them is quite

troubling. Indeed, there is a litany of cases holding that a debtor's admission that he did not read his schedules and statement of financial affairs, or merely glanced over them, satisfies § 727(a)(4)'s requirement of fraudulent intent. *See, e.g., Jordan v. Bren (In re Bren)*, 303 B.R. 610, 615 (8th Cir. B.A.P. 2004), *rev'd on other grounds*, *Jordan v. Bren (In re Bren)*, 122 Fed. Appx. 285 (8th Cir. 2005); *In re Olbur*, 314 B.R. 732, 746 (Bankr. N.D. Ill. 2004); *Bohm v. Dolata (In re Dolata)*, 306 B.R. 97, 148-51 (Bankr. W.D. Pa. 2004); *Dean v. McDow*, 299 B.R. 133, 140 (E.D. Va. 2003); *Mosley v. Sims (In re Sims)*, 148 B.R. 553, 557 (Bankr. E.D. Ark. 1992). Thus, the Court concludes that Peres' failure to read the Schedules and SOFA prior to their filing also demonstrates Peres' reckless indifference to the truth of the information contained in those documents.[9]

The Debtors raise three arguments in support of their contention that they lacked the required fraudulent intent. First, the Debtors argue that they are not native English speakers and did not understand the Schedules and SOFA. Second, the Debtors argue that they justifiably relied on the advice of counsel in filing the Schedules and SOFA. Finally, the Debtors argue that their subsequent amendments to the Schedules and SOFA show their good faith and lack of fraudulent intent.

None of these arguments are persuasive for the following reasons. First, the evidence does not support the Debtors' argument that they failed to ensure the accuracy of their bankruptcy documents because they did not fully understand English or the documents. Peres testified that he

---

[9] This finding and conclusion does not extend to Medina. "[T]he [Bankruptcy] Code does not allow attribution of intent from spouse to spouse." *First Tex. Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 993 (5th Cir. 1983) (citing *United States v. One 1977 Cherokee Jeep*, 639 F.2d 212 (5th Cir.1981)). At the commencement of trial, the parties stipulated to the fact that Medina signed the bankruptcy documents and that she was aware of the money held by DMG, but Medina did not appear at trial. As a result, there is simply no evidence in the record regarding whether Medina did, or did not, read the bankruptcy documents before she signed them. Accordingly, as regards Medina's fraudulent intent, the Court relies upon the significant and numerous false statements and/or omissions in the Schedules and SOFA she signed as evidence of Medina's reckless indifference to the truth and hence, her fraudulent intent.

began studying English in boarding school in India at age 10 or 12. Audiotape: Trial conducted on 8/21/07 at 2:28:12-26 (on file with the Court). Peres further testified that he moved to the United States in 1981. Audiotape: Trial conducted on 8/21/07 at 2:28:30-35 (on file with the Court). Since then, Peres has started, run, and/or sold several businesses or pieces of real property. Peres admitted that he reads English. Audiotape: Trial conducted on 8/21/07 at 2:28:58-30:08 (on file with the Court). From the Court's own observations at trial, Peres has a clear command of the English language and his vocabulary is far from unsophisticated. Peres even testified that he had been pursuing a lawsuit pro se against Chase Bank and had conducted some legal research on his own behalf in connection with that lawsuit. Audiotape: Trial conducted on 8/21/07 at 3:08:24-10:54 (on file with the Court).

As for his wife, Peres testified that she immigrated to the United States and is not a native speaker of English. Audiotape: Trial conducted on 8/21/07 at 3:27:00-27:20 (on file with the Court). While Peres did testify that his wife's comprehension of legal documents is limited and that she is not "comfortable" with such things, Audiotape: Trial conducted on 8/21/07 at 3:27:27-27:42 (on file with the Court), other evidence at trial shows that she understands English well enough to actively participate in a § 341 meeting and sign her name to the bankruptcy documents in the required places.

Moreover, the questions on the Schedules and SOFA that the Debtors failed to accurately answer are quite straight-forward and, as written, use commonly understood language, not slang or complicated legal jargon. After personally observing Peres, it is clear that he would have understood the language used in the Schedules and SOFA if he had bothered to read them. Moreover, Medina has not offered credible evidence to support a finding that her command of English is so poor as to render her unable to understand the straight-forward directives of the documents she signed; and

thus, she has failed to establish this defense as well.[10]

Next, the Debtors argue that "Mr. Bickley inadequately explained the meaning or requirements of the schedules and petitions signed and filed in the parties' initial petition. [sic] The attorney for the [Debtors] had the complete information to have adequately and completely filled out the [Debtors'] petition for bankruptcy." Defendants' Proposed Findings of Fact and Conclusions of Law, page 5, Docket No. 33. While reliance on attorney advice can be a defense, the defense is only available if the Debtors' reliance on attorney advice was "reasonable and in good faith." *Gebhardt v. Gartner (In re Gartner)*, 326 B.R. 357, 374 (citing *In re Dreyer*, 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991)). Moreover, the reliance on counsel defense is only available if the advice of counsel was needed for the Debtors to be able to ascertain what they needed to disclose. *In re Dolata*, 306 B.R. at 150 (collecting cases).

Here, the Debtors' alleged reliance on counsel was not reasonable (and in good faith) or necessary. It is not reasonable for Peres to lay the blame on Bickley for the errors and omissions on the Schedules and SOFA when he failed to read those documents before swearing to their accuracy. Nor can a debtor who so cavalierly ignores his disclosure obligations by not reading the documents before signing and filing them claim to be acting in good faith. Moreover, advice of counsel was not needed for the Debtors to be able to ascertain what they needed to disclose in response to the questions that were falsely answered on the Schedules and SOFA. The Debtors should have been able to determine what information was required from the straight-forward language of the Schedules

_____

[10] The Fifth Circuit has explained, "[w]hile the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the [plaintiff] makes a prima facie case." *In re Reed*, 700 F.2d at 992-93. Accordingly, as relevant here, after the U.S. Trustee made its prima facie case, the Debtors were required to prove their inability to understand the documents, which they failed to do on this record.

**Memorandum Opinion** **Page 17**

and SOFA themselves.

Finally, the Debtors point to their subsequent amendments to the Schedules and SOFA as evidence of their good faith. While the Fifth Circuit has suggested that a debtor's efforts to clear up inconsistencies and omissions with amended schedules "may be considered in analyzing findings of actual intent to defraud," *see Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 383 (5th Cir. 2001) (citing *In re Beaubouef*, 966 F.2d at 178), even after their amendments, the Debtors failed to cure all of the inconsistencies and omissions in the Schedules and SOFA – *i.e.*, the amended SOFA still fails to disclose the eminent domain proceeding or any income for 2005 (while amended Schedule I shows total monthly income of $2,556.66). If anything, this provides further evidence of the Debtors' reckless indifference to the truth of their bankruptcy documents. *See In re Beaubouef*, 966 F.2d at 178.

Furthermore, the Debtors only amended the Schedules and SOFA after two sessions of the § 341 meeting. At the initial session of the creditors' meeting, the Debtors were confronted about the omissions and irregularities in the Schedules and SOFA. The fact that the Debtors finally amended these documents after the Trustee and representatives from the U.S. Trustee's office continued to point out errors and omissions in the Schedules and SOFA does not change the Court's view that the original Schedules and SOFA were filed with a reckless indifference to the truth, as was the amended SOFA. *See In re Sholdra*, 249 F.3d at 383 (upholding a grant of summary judgment denying discharge where debtor only corrected errors and omissions after creditor pointed out these false statements in debtor's deposition); *In re Beaubouef*, 966 F.2d at 178 (criticizing debtor's failure to amend filings until after having errors and omissions raised in 2004 examination).

### 5.    **Materiality**

Finally, the false statements or omissions must be material to the Case. "A false oath is material if it relates to the debtor's business transactions or concerns the discovery of assets or business dealings." *In re Gartner*, 326 B.R. at 372 (Bankr. S.D. Tex. 2005). The value of the assets or the business dealings is not relevant to materiality – "[t]he recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding . . . . Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them." *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) (per curiam), *quoted with approval in In re Beaubouef*, 966 F.2d at 178.

The eminent domain proceeding, which had only concluded two months prior to the filing of the bankruptcy petition, was material. It resulted in the disposition of real property that had been owned by the Debtors and the award of a significant amount of cash to the Debtors. The existence of this lawsuit relates to the discovery of assets and was material.

The Debtors' interest in DMG also should have been disclosed on the original Schedules and SOFA. DMG had a bank account containing $176,375.61 on the day the bankruptcy petition was filed. This account was in the sole control of the Debtors and was being used to pay for the Debtors' personal expenses. The materiality of this omission is obvious. Similarly, the Debtors' failure to disclose their income from DMG in 2005 relates to the discovery of assets and was material.

Finally, all of the business entities that the Debtors had operated or owned within the six years before the bankruptcy filing should have been disclosed, even if they were no longer operating entities. Because "[c]reditors are entitled to judge for themselves what will benefit, and what will prejudice, them," the assertion that an undisclosed business interest is worthless is a "specious"

defense in this context. *In re Beaubouef*, 966 F. 2d at 178. All of the businesses listed in response to question 18 of the amended SOFA were material and should have been disclosed in the original SOFA. The business entities in which the Debtors' had an interest on the petition date should have also been disclosed on Schedule B.

Because the U.S. Trustee carried its burden of proof and demonstrated, by a preponderance of the evidence, each of the five elements of a § 727(a)(4) claim, the Court concludes that the Debtors' discharge must be denied on this ground.

## III. Conclusion

Having considered the evidence presented and the applicable law, the Court concludes that the Debtors shall be denied a discharge in accordance with 11 U.S.C. § 727(a)(4)(A) for having knowingly and fraudulently made false oaths in connection with the Case. A judgment consistent with this Memorandum Opinion shall be entered separately.

### ### End of Memorandum Opinion ###